**ANGUS CHEMICAL CO., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Slip Op. 96-169.**
**Court No. 94–06–00334.**

United States Court of International Trade.

Oct. 18, 1996.

944

Frederick L. Ikenson, P.C., Washington, DC (Frederick L. Ikenson, Washington, DC, Larry Hampel, Silver Spring, MD, and Joseph A. Perna, V, Springfield, PA); Novak & Macey, Chicago, IL (Stephen Novack, P. Andrew Fleming and Sandra E. Raitt, Chicago, IL), for plaintiff.

Lyn M. Schlitt, General Counsel, James A. Toupin, Deputy General Counsel, Office of the General Counsel, United States International Trade Commission, Washington, DC (Lyle B. Vander Schaaf), for defendant.

## MEMORANDUM OPINION

DiCARLO, Chief Judge:

Plaintiff, Angus Chemical Company, moves for judgment on the agency record and for an order setting aside the negative injury determination by the United States International Trade Commission with respect to nitromethane from the People's Republic of China. *Nitromethane from the People's Republic of China,* 59 Fed.Reg. 24,470 (Int'l Trade Comm'n 1994). Although the Department of Commerce in its parallel investigation determined the imports were sold at a dumping margin of 233.7 percent, *Nitromethane from the People's Republic of China,* 58 Fed.Reg. 59,237, 59,239 (aff. prelim. determination, sales at LTFV) (Dep't Comm.1993) [hereinafter *ITA Preliminary Determination* ], a majority of the Commission found that the U.S. nitromethane industry was not materially injured or threatened with material injury by reason of imports of nitromethane from the People's Republic of China (PRC). *Nitromethane from the People's Republic of China,* USITC Pub. 2773, Inv. No. 731–TA–650 (Final) I–5 (May 1994) [hereinafter *ITC Final Determination* ]. Angus now challenges the Commission's findings.

## BACKGROUND

Angus, presently the sole American producer of nitromethane, filed a petition for the imposition of antidumping duties on imports of nitromethane from the PRC. Nitromethane is one of a group of chemicals known as nitroalkanes, which consist of an alkane molecule, such as methane, ethane, or propane, where one of the hydrogen atoms has been replaced by a nitro group ($NO_2$). Nitromethane is used in a number of products, including chloropicrin, hobby fuels, racing fuels, explosives, degreasing solvents, preservatives, pharmaceuticals, and pharmaceutical intermediates. Angus's nitromethane production process results in the joint production of four nitroalkanes—nitrometh-

ane, nitroethane, 1–nitropropane, and 2–nitropropane. Of these products, nitromethane has the highest value. (Br. in Supp. of Pl.'s Mot. for J. on the Agency R. at 7–8 & n. 5) [hereinafter Pl.'s Br.].

## 1. The Investigation

In 1990, there were virtually no Chinese imports in the U.S. market. After a May 1, 1991 explosion at the Angus plant, Angus began importing significant quantities of nitromethane from the PRC to meet existing nitromethane contracts and for use in Angus's downstream production of nitromethane derivatives. By March of 1992, Angus's plant had returned to partial operation. Roughly half of its nitroalkane production capacity had been restored. Angus ceased importing nitromethane from the PRC, although PRC nitromethane producers continued to sell nitromethane in the U.S. until August 1993. *Id.* at 9–10.

During the period of investigation, the only other U.S. producer of nitromethane was W.R. Grace & Co. Grace's production method also resulted in production of nitromethane and three other nitroalkane products. *Id.* at 8. Grace exited the market in mid–1992 for reasons unrelated to the Less Than Fair Value (LTFV) Sales. *ITC Final Determination* at I–9 to I–10. The Commission defined the domestic industry to include both Angus and Grace. *Id.* at I–7.

In its antidumping investigation, Commerce found Chinese nitromethane was sold at a dumping margin of 233.7 percent. *Id.* at II–4. When Commerce issued its preliminary LTFV determination in November 1993, it found there had been a surge of imports which constituted sufficient "critical circumstances." *ITA Preliminary Determination,* 58 Fed.Reg. at 59,238–39. The effective date for potential duty assessment was therefore set retroactively to August 10, 1993. *Nitromethane from the People's Republic of China,* 59 Fed.Reg. 14,834, 14,836 (aff. final determination, sales at LTFV) (Dep't Comm.1994). Following the finding of "critical circumstances," no imports were made after early August 1993. *ITC Final*

*Determination* at I–11. The Commission's parallel injury investigation found imports of nitromethane from the PRC did not materially injure or threaten with material injury the domestic nitromethane industry. *ITC Final Determination* at I–3.

Angus now contests the Commission's final determination, claiming that the four Commissioners [1] who reached the negative determinations have committed errors sufficient to warrant reversal and remand.

## 2. Standard of Review

■ The court's role is to uphold the Commissioner's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). As the trier of fact, the Commission must assess the quality of the evidence and give such weight to the evidence as it believes is justified.

## DISCUSSION

In its final antidumping and countervailing duty investigations, the Commission is required to determine whether

> (A) an industry in the United States—
>
> > (i) is materially injured, or
> >
> > (ii) is threatened with material injury, or
>
> (B) the establishment of an industry in the United States is materially retarded,
>
> by reason of imports, or sales (or the likelihood of sales) for importation, of the merchandise with respect to which the administering authority has made an affirmative determination under subsection (a) of this section.

19 U.S.C. § 1671d(b)(1) (1988) (countervailing duty); 19 U.S.C. § 1673d(b)(1) (1988)

---

1. Commissioner Bragg did not participate in these proceedings. Commissioner Crawford filed a dissenting opinion. *ITC Final Determination* at I–3 n. 2.

(antidumping). To determine material injury, subsection 1677(7) directs that:

the Commission, in each case—

(i) shall consider—

(I) the volume of imports of the merchandise which is the subject of the investigation,

(II) the effect of imports of that merchandise on prices in the United States for like products, and

(III) the impact of imports of such merchandise on domestic producers of like products, but only in the context of production operations within the United States; and

(ii) may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports. . . .

[Further], the Commission shall explain its analysis of each factor considered under clause (i) and identify each factor considered under clause (ii) and explain in full its relevance to the determination.

19 U.S.C. § 1677(7)(B) (1988).

Angus argues that because of numerous errors in the Commission's final negative material injury and threat determinations, this matter should be remanded.

## I. Chairman Newquist and Commissioner Rohr's Finding of Robustness.

■ Chairman Newquist and Commissioner Rohr, in their investigation, found the domestic industry's performance was "robust"—both before and after the ten-month shutdown of Angus's facility. The Commissioners based their decision on data demonstrating "increases in 1993 in the industry's share of U.S. apparent consumption, shipments, capacity utilization, and net sales, as well as the strong performance in production and profitability." *ITC Final Determination* at I–15 n. 79. Chairman Newquist and Commissioner Rohr gave limited weight to a mechanical comparison of 1990 data to data from 1993, finding, as did Vice Chairman Watson and Commissioner Nuzum, that such a comparison would be improper. *Id.* at I–11.

Angus contests this finding. First, Angus argues that the Commission wrongly compared 1993 data—the first full year of production—with the two prior, but partial, years 1991 and 1992. Second, Angus challenges the Commission's methodology for analyzing the data upon which Chairman Newquist and Commissioner Rohr based their decision. Finally, Angus questions Chairman Newquist and Commissioner Rohr's finding of no material injury, because it was made without examining import volume, price effects, or impact.

### A. Period of Review

Angus claims that any finding of increased market share for domestic industries from 1991 or 1992 to 1993 would be a false conclusion because its plant was not in full production during 1991 and 1992. According to Angus, a simple comparison of before-explosion and after-explosion profit and return-on-investment data demonstrates a marked deterioration in the domestic industry's position. Angus claims that domestic industry shipments, capacity utilization, net sales, and domestic industry production have decreased from 1990 to 1993. Further, Angus argues the cessation of imports in August 1993 due to the susceptibility of the imports to antidumping duties exaggerated the domestic industry's market share and further inflated the false vitality of the industry. (Pl.'s Br. at 13–17.)

The court disagrees. Chairman Newquist and Commissioner Rohr concluded that a mechanical comparison of 1990 and 1993 data would "distort" its analysis both in view of the many "intervening factors" that occurred in the domestic industry during that period *ITC Final Determination* at I–11, and because the injury requirement mandates that the Commission find whether "an industry suffers *present* material injury," *Chaparral Steel Co. v. United States,* 901 F.2d 1097, 1104 (Fed.Cir.1990). The Commission found there was a very different industry in 1993 involving an entirely different financial calculus than the one that existed in 1990. *ITC Final Determination* at I–11.

The departure from the industry of one of its two domestic producers—W.R. Grace &

Co.—significantly changed market dynamics, rendering comparison of the 1990 data with the 1993 data aberrational. It is conceded that Grace's departure was based on a decision made well before imports had a significant presence in the United States market. *Id.* at I–9 to I–10. Grace decided to reorganize its line of business to concentrate on certain core activities, which did not include nitroparaffins. *Id.* The industry's strong performance in 1993 occurred despite Grace's departure. *Id.* at I–15 n. 79. That departure left the industry with a single supplier for nitromethane in the U.S. market, which the Commission recognized significantly changed market dynamics. *Id.* at I–10. Purchasers of nitromethane had turned to Chinese imports as an alternative, supplemental source. *Id.*

Moreover, the explosion at the Angus facility disrupted domestic industry production during the period between 1990 and 1993, precluding comparison between those two years. As the Commission found, "measures of profitability based on 1993 total assets or changes in book value of property, plant, and equipment versus the same items for 1990 [were] not comparable" because of the changed asset base as a result of Angus's investments into the rebuilding of its plant after the explosion. *ITC Final Determination* at I–14 n. 71. Angus's post-explosion operations involved production in a different plant with a different cost structure and assets; therefore, the Commission could not compare ratios of profitability, whether based on sales or assets for the two periods before and after the explosion. *Id.*

Further, Angus started importing nitromethane to fulfill its existing contracts and to maintain its captive production of downstream derivatives. (Pl.'s Br. at 9.) Angus's importation of nitromethane was an important element of competition affecting the industry.

The Commission took these unusual circumstances into account when formulating its determination, and its decision to focus on 1993 data and make only limited comparisons between 1990 and 1993 data fell well within its discretion. *Kenda Rubber Indus. Co. v. United States*, 10 CIT 120, 127, 630

F.Supp. 354, 359 (1986) (noting Commission has "discretion to examine a period that most reasonably allows it to determine" injury). Accordingly, the court finds that substantial evidence supports the Commission's de-emphasis of the mechanical comparison of 1990 to 1993 data.

## B. Profitability Analysis Methodology

■ Angus also attacks the Commission's profitability analysis. Angus contends the operating income data reported by the Commission is in large part unreliable, and does not lend support to a finding that Angus's profits were strong. (Pl.'s Br. at 18.) Angus attributes this to an arbitrary allocation of cost of goods sold as well as an arbitrary allocation of selling, general and administrative expenses. Angus contends that allocating costs for individual products such as nitromethane that are produced as part of a joint production process is not as reliable as determining costs for the production process as a whole. *Id.* at 18–19.

According to Angus, the Commission staff recognized the essential unreliability of its approach in the Prehearing Report. Angus argues the Prehearing Report found that an allocation based on the market value of individual products, rather than on their physical volumes, would be more suitable because of the large differences in value of each of the nitroparaffins produced by the joint production method. Due to these differences, Angus contends the volume allocation method results in profits substantially greater than those yielded by the market value method. *Id.* at 20–21; (Conf.Doc. 10, USITC Prehearing Staff Rep. at I–33 to I–34.)

Angus suggests two alternative methodologies. The first methodology, contribution analysis (also known as direct product profitability), focuses on differences between a product's revenue and its direct costs, and would not be affected by changes in the asset base or cost structure. (Pl.'s Br. at 22–23.) Application of contribution analysis to Angus's nitromethane operation, according to Angus, demonstrates a decline in its financial performance. *Id.* at 23. Alternatively, Angus argues the Commission could

have analyzed Angus's profitability on a per-unit basis—which Angus claims would have removed the "large year-to-year swings in business activity and provide[d] a stable basis of comparison." *Id.* at 24. Angus notes this alternative methodology, which was present in the Prehearing Report, (Conf.Doc. 10, USITC Prehearing Staff Rep. at I–37), also demonstrates declining operating profit per unit, and would not support Chairman Newquist and Commissioner Rohr's finding of robustness, (Pl.'s Br. at 24).

The court finds the Commission's methodology of analyzing industry profitability reasonable. Subsections 1677(4)(D) and 1677(10), title 19, United States Code direct the Commission to make a profitability analysis specific to the product rather than to the product line when it has sufficient information to do so, as it did here. 19 U.S.C. § 1677(4)(D) (1988) (providing, in pertinent part, that "[t]he effect of subsidized or dumped imports shall be assessed in relation to the United States production of a like product if available data permit"); 19 U.S.C. § 1677(10) (1988) (defining "like product"); *see Hannibal Indus., Inc. v. United States,* 13 CIT 202, 710 F.Supp. 332 (1989) (requiring Commission to use data specific to like product rather than product line where "record contains sufficient information"). The Commissioners reviewed Grace's nitroparaffins operations as a whole because separate data on nitromethane was not available from Grace, and because nitroparaffins was the narrowest group of products that included the like product nitromethane. *ITC Final Determination* at I–13; *see* 19 U.S.C. § 1677(4)(D) (providing, in pertinent part, when data is not available to make product-specific analysis, the Commission shall assess "[t]he effect of the subsidized or dumped imports ... by the examination of the production of the narrowest group or range of products, which contains a like product, for which the necessary information can be provided.") However, with regard to Angus, the Commission was able to make a profitability analysis specific to its product and did so. *ITC Final Determination* at I–13. Therefore, the Commission's actions were in accordance with the statutory mandate.

The Commission staff also presented the Commissioners with overall establishment data and nitroparaffin operation data. (Conf. Doc. 20, USITC Final Staff Rep. at I–33 to I–35, I–37 to I–40.) The Commission therefore had an opportunity to consider Angus's nitroparaffins operations as a whole, and to draw from that data a conclusion supported by substantial evidence. *Companhia Paulista De Ferro–Ligas v. United States,* 20 CIT ——, ——, Slip Op. 96–63 at 8, 1996 WL 189515 (Apr. 15, 1996) (finding "the Commission is presumed to have considered the entire record absent evidence to the contrary"). The court finds the Commission's conclusions are supported by substantial evidence.

The Commission found accuracy problems with Angus's direct product profitability methodology. The Commission's final report found that many of the nitroalkanes were captively consumed. (Def. U.S. Int'l Trade Comm.'s Mem. in Opp'n to Pl.'s Mot. for J. on the Agency R. at 31 [hereinafter Def.'s Br.]; Conf.Doc. 20, Final Staff Rep. at I–39 to I–40.) Angus used the majority of the nitromethane it manufactured internally, in part because the "derivatives ... have a much higher market value and volume of trade sales than the nitroparaffins, including nitromethane." (Def.'s Br. at 31; *see also* Conf.Doc. 20, Final Staff Rep. at I–39.) Valuation of the nitromethane under the direct product profitability methodology would have been difficult, therefore, because the downstream captive consumption involved internal transfers at cost resulting in the production of more valuable end products. Angus itself noted the difficulty in selecting the proper methodology, arguing "the result of either methodology is arbitrary. One generates a profit ratio which some would view as intuitively high and the other generates a profit ratio which some would regard as modest." (Pl.'s Reply Br. at 8.) In light of the advantages and disadvantages of both approaches, the Commission properly exercised its discretion by choosing among acceptable methodologies, and its choice is supported by substantial evidence. *See United States Steel Group v. United States,* 18 CIT 1190, 1218, 873 F.Supp. 673, 699 (1994) (providing "[i]t is within the agency's discretion to select a particular methodology, as long as the choice

is supported by substantial evidence"), *aff'd,* 96 F.3d 1352 (Fed.Cir.1996).

Angus's suggested contribution analysis method is therefore unpersuasive. According to Angus, contribution analysis is "applied by calculating the difference between the revenues generated by nitromethane sales, and the costs directly assignable to nitromethane production, *i.e.,* the raw materials cost of nitromethane." (Pl.'s Br. at 22–23.) Upon application of this methodology, Angus's own data demonstrate increasing revenue and material costs from 1991 to 1993. *Id.* at 23; (Pl.'s Mot. for J. on the Agency R. (Conf.Version) at 23, Table 4.) This increased revenue supports Chairman Newquist and Commissioner Rohr's finding of "robustness," while increased material costs suggests that a factor outside of imports was affecting the industry.

Moreover, as defendant points out, contribution analysis "is typically used in conjunction with an analysis of fixed costs to determine what a company's change in costs and operations will be when it decreases or increases the production of one co-product at the expense of other co-products," (Def.'s Br. at 33); *see also Accountants' Handbook* 9.37–9.40 (Rufus Wixon and Walter G. Kell eds., 4th ed. 1963), not as Angus asserts, as a general indicator of profitability. Angus itself casts doubt on the applicability of this alternative methodology, noting that "[o]f course, a high contribution margin in itself [the factor Angus urges the court to use as a judge of profitability] does not imply profitability." (Pl.'s Br. at 23, n. 55.) Accordingly, the Commission acted reasonably in not adopting this particular analysis.

Finally, the Commission examined Angus's proposed alternative methodology, unit profitability analysis, which calculates revenues and costs on a unit basis. (Conf.Doc. 20, Final Staff Rep. at I–41, Table 10.) The Commission considered and found this methodology to be deficient, because it relied on total asset figures for 1990 and 1993 that were not comparable. *See id.* at I–42 to I–43. Substantial evidence supports the Commission's finding that the methodology would not have provided accurate results because of

Angus's significant investments in its new plant.

## C. Impact of LTFV Imports on the Industry's Health

■ Chairman Newquist and Commissioner Rohr found that the domestic industry producing nitromethane was not experiencing material injury.

> In particular, they note[d] the robust performance of the domestic industry both before and following the ten-month shutdown of ANGUS's facility, as demonstrated by increases in 1993 in the industry's share of U.S. apparent consumption, shipments, capacity utilization, and net sales, as well as the strong performance in production and profitability.

*ITC Final Determination* at I–15 n. 79. As Chairman Newquist and Commissioner Rohr determined that the domestic industry producing nitromethane was not experiencing material injury, they did not analyze whether there was material injury by reason of LTFV imports. *Id.* at I–15 n. 80. Chairman Newquist and Commissioner Rohr's methodology is known as a two-step or bifurcated analysis. Under the two-step approach, a commissioner first assesses the state of the particular domestic industry. If the commissioner concludes that the industry is materially injured, the analysis then proceeds to a separate inquiry as to whether the relevant imports contribute in a non-*de minimis* way to that material injury. *United States Steel Group v. United States,* 96 F.3d 1352, 1360–61 (Fed. Cir.1996).

Angus claims Chairman Newquist and Commissioner Rohr failed to consider the industry's health in the context of the impact of the LTFV imports on the industry. According to Angus, the Commission must consider whether the industry is experiencing material injury, not whether the domestic industry is healthy. (Pl.'s Br. at 28.) Angus argues a healthy industry may still experience injury. *Id.* As Chairman Newquist and Commissioner Rohr merely found the domestic industry's performance to be robust, Angus contends they must have assumed that the domestic industry was not experiencing injury. *Id.* at 28–29.

According to Angus, this court in *Republic Steel Corp. v. United States,* 8 CIT 29, 591 F.Supp. 640 (1984) found that "health" or "robustness" alone is not the equivalent of an absence of material injury. Observing that the Commission "should not be engaged in a determination of whether an industry is 'healthy[,]' " the court said:

A 'healthy' industry can be experiencing injury from importations and an 'unhealthy' industry can be unaffected by importations. The purpose of the ITC's investigation is to determine whether imports are a cause of any effect on an industry which could amount to 'material injury.' This is the clear meaning of the detailed statutory instructions on the weighing of injury contained in 19 U.S.C. § 1677(7).

8 CIT at 39, 591 F.Supp. at 649.

Angus contends the detailed statutory instructions in subsection 1677(7) mandate that the Commissioners, in making their material injury determination, must consider the volume, price effects, and impact of the subject imports in each case to determine whether the domestic industry was experiencing material injury. This mandate, Angus argues, was reflected in the 1988 amendments to 19 U.S.C. § 1677(7), and their accompanying legislative history, Finance Comm., U.S. Senate, *Omnibus Trade Act of 1987,* S.Rep. No. 100–71, at 115–18 (1987). Congress amended subsection 1677(7) to direct that the Commission (1) shall evaluate import volume, price effects, and impact "in each case"; (2) may "consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports"; and (3) in every determination, shall explain its analysis of each of the three mandatory factors, and shall identify each discretionary factor, explaining in full its relevance to the determination. 19 U.S.C. § 1677(7) (1988).

Angus contends that Congress's purpose in amending the statute was that it wanted to ensure that the Commission consider, "in each case," the industry's health in the context of the impact of the imports, and in each case, explain its analysis of each of the three mandatory factors. According to Angus,

Chairman Newquist and Commissioner Rohr's methodology fails to meet this mandate. (Pl.'s Br. at 30–34.)

Defendant contends Angus has misunderstood Chairman Newquist and Commissioner Rohr's actions. According to defendant, the Commission addressed a number of indicators in detail that disclosed no evidence of material injury, but rather indicated the contrary—that the industry was "robust" both before and after Angus's shutdown. (Def.'s Br. at 40–42); *see ITC Final Determination* at I–8 to I–15 (finding, for instance, increases in production, hours worked by production and related workers, net sales values, and operating income during the period of investigation). According to defendant, therefore, Chairman Newquist and Commissioner Rohr were entitled to end their investigation at that point in the proceedings. (Def.'s Br. at 42–46.)

The Court of Appeals for the Federal Circuit (CAFC) has recognized that there exists a "complicated network of statutory tests that must or may be employed by each commissioner in deciding whether the causal effects of particular imports support imposition of countervailing or antidumping duties." *United States Steel Group v. United States,* 96 F.3d 1352, 1360–61 (Fed.Cir.1996). The CAFC has further explained that the two-step methodology is consistent with statutory mandates. *Id.* at 1361. Indeed, there is no indication in the legislative history of the 1988 amendments to 19 U.S.C. § 1677(7) that Congress intended for the long-standing two-step test to be replaced. Because Chairman Newquist and Commissioner Rohr found no material injury, there was no need to proceed to the second step of the inquiry. The court finds that such an application of the two-step analysis comports with relevant statutory mandates and is in accordance with law.

## II. Findings of Vice–Chairman Watson and Commissioner Nuzum.

Vice Chairman Watson and Commissioner Nuzum independently considered whether the domestic industry was experiencing material injury by reason of LTFV imports, by examining the volume of LTFV imports, the price effects of those imports, and their im-

pact on domestic producers. Upon review of these factors, Vice Chairman Watson and Commissioner Nuzum found there was no material injury by reason of the LTFV imports. *ITC Final Determination* at I–15 to I–24.

Angus contends the Commission failed (a) to consider that no imports would have occurred if they had been at prices not less than fair value and (b) to define the domestic industry throughout its analysis as including both Angus and Grace. (Pl.'s Br. at 35–63.)

### A. Volume of Imports

In examining the volume of imports of nitromethane into the United States, subsection 1677(7)(C) provides that the Commission "shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant." 19 U.S.C. § 1677(7)(C)(i) (1988).

■ Vice Chairman Watson and Commissioner Nuzum found the imported nitromethane market share had shrunk since 1991. During this period, the Commission also determined that Angus's market share had increased from 1990 to 1993. *ITC Final Determination* at I–16 to I–17.

In evaluating import volume, Vice Chairman Watson and Commissioner Nuzum considered Angus's production outage during 1991 and 1992 which resulted in a shortage of domestically-produced nitromethane. Because of this shortage, the Commissioners found an increased supply of imported nitromethane—almost entirely from China—was brought into the country. Angus imported much of this nitromethane, as Grace, the only other domestic producer of nitromethane, was unable to satisfy demand. As Angus returned to production, Angus began canceling import contracts (some nitromethane orders, however, could not be canceled), and the volume of imports significantly decreased. Further, Grace exited the nitromethane industry in 1992 for reasons unrelated to competition from LTFV imports. *Id.* Upon reviewing the data, Vice Chairman Watson and Commissioner Nuzum did not

consider the 1993 import levels problematic, characterizing such imports as "only an alternative, second source of supply for U.S. purchasers[.]" *Id.* at I–17.

Angus rejects these findings. First, Angus contends Vice–Chairman Watson and Commissioner Nuzum's use of 1991 as a base year for gauging subsequent changes in import volume or market share was irrational, as Angus's production was limited to only four months of that year. According to Angus, therefore, any increase in its market share would have been a natural result of Angus's return to full capacity. (Pl.'s Br. at 38.) Using 1990 as a base year, Angus argues that, in absolute and relative terms, there was a net increase in import volume between 1990 and 1993. This increase, according to Angus, was significant. *Id.* at 36.

Second, Angus claims Vice–Chairman Watson and Commissioner Nuzum myopically focused on Angus's market share, rather than on the share of the entire domestic industry between 1990 and 1993 as is mandated by statute. According to Angus, the appropriate definition of the entire domestic industry would include the facilities, equipment and workers used by Angus and Grace together. *Id.* at 38–39.

Third, Angus argues that imports cannot serve as an alternative source of supply for nitromethane purchasers, as "[t]he record shows incontrovertibly that when Chinese nitromethane is priced at not less than fair value, no U.S. purchaser will purchase it." *Id.* at 39–40 (arguing imports ceased in August 1993 because they became subject to antidumping duties of 233.7%). As a result, Angus contends, there is substantial evidence on the record that imports were displacing domestic industry sales, and therefore the Commissioners should have characterized the volume of those imports as significant. *Id.* at 40.

Defendant argues that increased volumes of imports were not "significant" because they were caused by specific market conditions not attributable to the effects of imports. (Def.'s Br. at 52–54.) The Commission evaluates import volume "in light of the 'conditions of trade, competition, and development regarding the industry concerned.'"

*General Motors Corp. v. United States,* 17 CIT 697, 711, 827 F.Supp. 774, 787 (1993) (quoting Finance Comm., U.S. Senate, *Trade Agreements Act of 1979,* S.Rep. No. 96–249, at 88 (1979) U.S.Code Cong. & Admin.News 1979, at 474). Some of the relevant "conditions of trade" included the explosion at the Angus plant, Grace's decision to exit the industry, and purchasers' interest in maintaining an alternative source of supply. (Def.'s Br. at 54.) According to the defendant, these factors, none of which were attributable to the effects of imports, caused significant changes in the market. Therefore, defendant argues, the Commission properly concluded that allegations of Angus's lost sales were not indicative of material injury. *Id.* at 55.

The explosion and Grace's exit from the industry created a new demand for imported nitromethane. Due to the interruption to Angus's production in 1991 and 1992, there was a shortage of domestically produced nitromethane, as Grace was unable to satisfy demand. *Id.; ITC Final Determination* at I–16. When Angus resumed production, defendant argues, it regained its previous market share, plus a portion of the market share formerly held by Grace. Angus's market share was therefore higher in 1993 than in 1990, before the plant explosion and before imports entered the United States in substantial quantities. (Def.'s Br. at 55–56); *ITC Final Determination* at I–16.

Purchasers after 1992 demonstrated a continued interest in using imports as an alternative or second source of supply. Vice–Chairman Watson and Commissioner Nuzum reported purchasers' concerns about "a repetition of the supply disruption that ensued after ANGUS's plant explosion." *ITC Final Determination* at I–17. These concerns were grounded in fact. According to Vice–Chairman Watson and Commissioner Nuzum's findings, the effects of the Angus shutdown were tremendous. The Commissioners found that some purchasers had to shut down, while others reduced production or reduced the nitromethane component in their products as a way of conserving the limited supplies of nitromethane available. *Id.* at I–17 n. 93, I–21; *cf. Gifford–Hill Cement Co. v.*

*United States,* 9 CIT 357, 368–69, 615 F.Supp. 577, 586 (1985) (finding desire for secondary supply source as reason for not regarding alleged lost sale as injurious).

Defendant discounts Angus's contention that imports decreased as a result of the suspension of liquidation of the LTFV imports, arguing the Commission accorded greater weight to the evidence showing imports decreasing just after Angus resumed production, even before suspension of liquidation. (Def.'s Br. at 57.) Defendant argues the Commissioners were entirely reasonable in not concluding that the decline was an effect of suspension of liquidation. Defendant contends, from these arguments, that Angus failed to satisfy its burden of showing that Vice–Chairman Watson and Commissioner Nuzum's conclusions were unreasonable. *Id.* at 57–58.

Vice Chairman Watson and Commissioner Nuzum were reasonable in their use of 1991 as a base year for judging changes in market share and import volume. The Commissioners recognized that the commencement of the importation of nitromethane was in large part due to Angus's orders which accounted for large shares of the Chinese nitromethane imports in 1991 and 1992. *ITC Final Determination* at I–16; (*see also* Conf.Doc. 20, Final Staff Rep. at I–53 n. 96) (providing exact percentage figures). Angus conceded that it turned to imports from China became "neither Grace nor sources in other countries had the capacity to satisfy [its] demands." *ITC Final Determination* at I–8 n. 22.

For the Commission to best judge the volume of the nitromethane imports, it must start its analysis from 1991, the year when the items were being imported into the U.S. by domestic producers, and judge subsequent change from that perspective. Angus's plant was not operational throughout 1991; therefore the initial increase in imports was not due to LTFV sales, but rather because of a decrease in the domestic supply. Moreover, Angus itself fueled the commencement of imports because of its inability to meet contractual obligations through its own production. This forced Angus to import nitromethane and to cancel supply contracts with a number of U.S. purchasers of nitrometh-

ane. *ITC Final Determination* at II–23 & n. 106; (*see also* Conf.Doc. 20, Final Staff Rep. at I–62 & n. 110) (noting quantities of nitromethane Angus was unable to deliver). The domestic market had significantly changed. As this change was not attributable to imports, substantial evidence supports the Commission's decision not to focus its investigation on import gains from 1990 to 1991.

The court also finds that the Commissioners did not myopically focus on Angus rather than the domestic industry and all its facilities and equipment utilized between 1990 and 1993. As noted earlier, the Commission concluded a direct comparison of industry figures from 1990 and 1993 would have been improper, due to fundamental, structural changes in the nitromethane market. *ITC Final Determination* at I–11. This finding is supported by substantial evidence.

■ The court furthermore disagrees that Vice Chairman Watson and Commissioner Nuzum erred in not finding that imports ceased solely in the face of antidumping duties. Angus claims the cessation of imports reveals that imports can only be sold at LTFV and are not a viable alternative supply at a fair value price. (Pl.'s Br. at 40.) The Commission recognized that imports ceased in August 1993, stating "the pending LTFV determination likely contributed to the cessation of Chinese imports." *ITC Final Determination* at I–11 n. 45. However, the fact that imports ceased does not necessarily lead to Angus's preferred reading of the data—*i.e.*, that imports were not a viable alternative source—because the Commissioners identified other key factors which influenced the decline of substitute imports into the United States. The Commission found that Angus's imports of nitromethane during its production outage constituted a large share of total imports. *Id.* at I–16. As Angus's production gradually came back on line beginning in March 1992, Angus began canceling its own import contracts, contributing to a considerable subsequent drop in import volumes. *Id.* The Commission noted that testimony at their hearings revealed that "*ANGUS's decision to cancel existing contracts* for Chinese nitromethane when its production facilities were coming back on

line, just as the Chinese were attempting to fulfill their obligations under those contracts, have *made the Chinese reluctant to participate in the U.S. market.*" *Id.* at I–25 to I–26 (emphasis added). Angus had furthermore sent notice to U.S. purchasers and to one Chinese company that Angus intended to enforce its patent rights which, Angus alleged, the particular Chinese company was violating. Such notice effectively eliminated at least one Chinese company's supply from the U.S. market. *Id.* at I–26 n. 160. In light of the variety of factors the Commission identified as contributing to the cessation of imports, the court disagrees with Angus's contention that the Commission erred in not finding that imports ceased solely in the face of antidumping duties, and further finds substantial evidence supports the Commission's finding that imports were a viable alternative source to U.S. nitromethane.

**B. Price Effects of the LTFV Imports**

■ In evaluating the effect of LTFV imports on prices, the Commission found that, although prices dropped, the decline was "due to unique market conditions existing in mid–1992 when Angus ... tried to recapture market share." *ITC Final Determination* at I–18. According to the Commission,

> [t]he oversupply situation that led to the price declines in the U.S. market was in large part the result of ANGUS's reentry into the market months ahead of schedule.... ANGUS priced its [inventories of Chinese nitromethane] below the prices other importers were offering in order to win these customers, and be in a position to continue to supply subsequently from its domestic production.

*Id.* at I–19.

The Commission further determined "ANGUS's increased market share, high net sales, high profitability, high operating income—particularly as a percentage of net sales—and significant production" did not support a finding that imports adversely affected the domestic price for nitromethane. *Id.* at I–21. As evidence of the absence of significant adverse price effects caused by LTFV imports, the Commission noted that Angus was operating "under forward con-

tracts for 1994 that it negotiated at high prices with its chloropicrin customers, and in all major markets for nitromethane, ANGUS's nitromethane was priced the same or higher for 1994 than during 1993." *Id.* (footnote omitted).

Angus claims the antidumping laws were designed to prevent situations in which domestic manufacturers must choose between losing sales and lowering their prices to match an unfair price. (Pl.'s Br. at 44.) If the nitromethane imports had not been sold at less than fair value, Angus claims, it would not have had to lower its price substantially to compete. Thus, Angus distinguishes the situation at hand from the situation where two domestic producers are in price competition. Angus argues competition with foreign producers who are underselling with LTFV imports is the exact situation which Congress wished to avoid. *Id.* at 43–44.

Angus further contends it was only able to make forward contracts at high prices once the LTFV imports had stopped. This, according to Angus, would suggest the imports did have an adverse price effect. *Id.* at 44–45. Moreover, Angus argues the finding that Angus was the price leader in lowering the domestic market price is erroneous. *Id.* at 55–58. Angus contends the Commission failed to make price comparisons for the relevant period the Commission was investigating. Once the relevant data is isolated, according to Angus, it demonstrates price leadership by the Chinese, not by the domestic manufacturers. *Id.* at 57. Angus contends the appropriate period of investigation is limited to "the last three quarters of 1992." *Id.* at 45.

The court finds substantial evidence supports the Commission's findings that imports were not price suppressing and that Angus, rather than imports, fueled the price declines. The Commission observed that "ANGUS's imported nitromethane was initially priced 20 to 50 percent below other imported Chinese nitromethane." *ITC Final Determination* at I–19. Grace, the other domestic producer of nitromethane, "reported difficulty only in competing on price with Angus—not with subject imports." *Id.* at I–22. The Commission further found prices stabilized in the market after the structural changes that occurred in 1991 and 1992, *id.* at I–20, and that domestic industry performance indicators showed no signs of adverse price effects, *id.* at I–21. Indeed, in some end-use markets, the Commission found the prices for nitromethane were relatively stable throughout the period of investigation. *Id.* at I–21.

The Commission also specifically cited higher quality and shorter lead times for acquisition of the domestic product, *id.* at I–20, and captive consumption of significant amounts of nitromethane, *id.* at I–21, as factors limiting adverse price effects. Thus, the Commission concluded Angus did not have to match the import prices to be competitive with Chinese nitromethane producers as purchasers would "likely pay more for the quality and delivery terms [that Angus could] offer, thereby reducing purchasers' handling, inventory, and related production costs." *Id.* at 35 n. 117. Because the Commission's conclusion that Angus was the industry price leader is supported by substantial evidence, the court disagrees with Angus's claim that its ability to command high prices after imports had stopped necessarily shows that imports were price-suppressing.

## C. Impact of LTFV Imports on Domestic Production.

■ According to Angus, the Commission wrongfully compared the domestic industry's 1993 market share—consisting only of Angus—with the market share of only part of the domestic industry in 1990—when the entire domestic industry consisted of both Angus and Grace. (Pl.'s Br. at 59–60.) Angus argues that, even though its own market share actually increased, the share held by the domestic industry as a whole shrank. *Id.* at 60. Thus, Angus argues, the Commission failed to evaluate "actual and potential decline in ... market share" as directed by statute. 19 U.S.C. § 1677(7)(C)(iii) (1988). The court disagrees. As noted earlier, a mechanical comparison of 1990 and 1993 data would lead to a distorted analysis. The Commission's choice of industry data was supported by substantial evidence.

Angus further argues the Commission failed to consider the allegation that if im-

ports were not sold at LTFV, there would be no imports at all. (Pl.'s Br. at 61.) Angus claims this theory is supported by record evidence, namely that imports of Chinese nitromethane ceased because of antidumping duties of 233.7 percent. *Id.* As discussed earlier, there is substantial evidence on the record revealing that imports ceased for reasons other than the announcement of antidumping duties. The Commission noted that there were other factors leading to the decline in imports, including an intellectual property dispute, *ITC Final Determination* at I–26, and Angus's cancellations of its own import contracts which accounted for a sizeable share of imports, *id.* at I–16.

■ The Commission found no significant adverse effect in assessing the impact of LTFV imports on Angus. The Commission found Angus's ability to recapture its 1990 market share after the plant explosion and to increase that market share in 1993 was evidence that Chinese nitromethane imports did not adversely impact the domestic market. *ITC Final Determination* at I–24. The Commission's conclusions are supported by substantial evidence on the record.

## III. Finding of No Threat of Material Injury.

Angus contends the Commission's finding that there was no threat of material injury from LTFV imports is flawed in two respects: (1) the Commission misconstrued industry data from 1991 and 1993, and (2) the Commission failed to recognize that LTFV imports suppressed prices, because Angus could only increase prices after imports had ceased. (Pl.'s Br. at 64–65.) Because of these analytical flaws, Angus contends "the Commissioners appear to have forgotten their statutory role, which is to determine whether a domestic industry . . . is materially injured or threatened with material injury by reason of LTFV imports." *Id.* at 65–66.

The court disagrees that the Commission erred in its threat analysis. Angus's arguments essentially rely upon the same points raised in protest of the Commission's finding that there was no material injury by reason of LTFV imports. As explained earlier, the court finds the Commission's choice of 1991

and 1993 industry data is supported by substantial evidence. Furthermore, the Commission's finding that significant adverse price effects were not likely is supported by substantial evidence. The Commission was fully cognizant that imports had ceased in August 1993, but did not reach the conclusion that the suspension of liquidation was responsible for the price increases in late 1993 and 1994. The Commission found that, prior to the suspension of liquidation, decreases in domestic prices for nitromethane "occurred as a result of ANGUS selling off its considerable inventories" of imports after its own production came back on line. *ITC Final Determination* at I–26. The Commission also noted Angus's selling price for Chinese nitromethane was lower than other importers' selling price. The Commission found this indicated any future price effects were not likely to be negative. *Id.* The Commission additionally noted that Angus had entered into forward contracts for 1994, which were at high prices and contained penalty clauses for customers' release from the contracts. Indeed, the Commission found Angus's nitromethane was priced the same or higher for 1994 than for 1993. *Id.* Substantial evidence therefore supports the Commission's finding that it is unlikely that subject imports will enter the U.S. at prices having an adverse effect on domestic prices. Substantial evidence also supports the Commission's determination that there is no threat of material injury by reason of LTFV imports from China.

## CONCLUSION

A careful review of the record demonstrates that substantial evidence supports the determination of the International Trade Commission. Although the data might be subject to other interpretations, the court will not weigh one potential theory against another. That is the responsibility of the Commission. Accordingly, the determination of the International Trade Commission is sustained.

## JUDGMENT ORDER

This action having been duly submitted for decision; and the court, after due delibera-

tion, having rendered a decision herein, it is hereby

**ORDERED** that Plaintiff's motion for Judgment on the Agency Record is denied; and it is further

**ORDERED** that the Determination of the International Trade Commission in *Nitromethane from the People's Republic of China,* USITC Pub. 2773, Inv. No. 731–TA–650 (Final) I–5 (May 1994), finding that the U.S. nitromethane industry is not materially injured or threatened with material injury by reason of imports of nitromethane from the People's Republic of China is sustained; and it is further

**ORDERED** that this action be, and hereby is, dismissed.

