**ANGUS CHEMICAL COMPANY,
Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–
Appellee.**

No. 97–1166.

United States Court of Appeals,
Federal Circuit.

April 9, 1998.

**BACKGROUND**

In 1993, Angus filed a petition with the ITC and the Department of Commerce ("Commerce") for the imposition of anti-dumping duties on imports of nitromethane from China. Angus, currently the sole U.S. producer of nitromethane, alleged that the domestic industry producing nitromethane was materially injured or threatened with material injury by imports from China that were sold in the United States at less than fair value.

Nitromethane is one of a group of chemicals known as nitroalkanes, which consist of an alkane molecule, such as methane, ethane, or propane, in which one of the hydrogen atoms has been replaced by a nitro group ($-NO_2$). Nitromethane is used in a number of products, including fuels, explosives, solvents, preservatives, and pharmaceuticals. Angus's nitromethane production process results in the joint production of four nitroalkanes, of which nitromethane has the highest value.

The statutory scheme of the Tariff Act of 1930, as amended, calls for Commerce to determine whether the imports were being sold in the United States for less than fair value, and for the ITC to determine whether the domestic industry was materially injured or threatened with material injury by the imports. *See* 19 U.S.C. § 1673 (1988).[3] Pursuant to the statute, and in response to Angus's petition, both Commerce and the ITC undertook the required investigations.

Commerce published a preliminary determination, 58 Fed.Reg. 59,237, and a final determination, 59 Fed.Reg. 14,834, concluding that imports of nitromethane from China were being sold, or were likely to be sold, at LTFV in the United States. Commerce

Frederick L. Ikenson, Frederick L. Ikenson, P.C., Washington, DC, argued for plaintiff-appellant. With him on the brief was Larry Hampel. Also on the brief were Stephen Novack and P. Andrew Fleming, Novack and Macey, Chicago, IL.

Cynthia P. Johnson, Office of the General Counsel, U.S. International Trade Commission, Washington, DC, argued for defendant-appellee. With her on the brief were Lyn M. Schlitt, General Counsel, and James A. Toupin, Deputy General Counsel.

Before NEWMAN, PLAGER, and BRYSON, Circuit Judges.

PLAGER, Circuit Judge.

Angus Chemical Company ("Angus") appeals from a Court of International Trade decision,[1] sustaining a determination by the International Trade Commission ("ITC" or "Commission"),[2] that the U.S. industry producing nitromethane was not materially injured, or threatened with material injury, by imports from China at less than fair value ("LTFV"). After a careful review of the record, we conclude that the Commission's determination is supported by substantial evidence and is in accordance with the law. Accordingly, we affirm.

1. *Angus Chem. Co. v. United States*, 944 F.Supp. 943 (Ct. Int'l Trade 1996).

2. *Nitromethane from the People's Republic of China*, 59 Fed.Reg. 24,470 (Int'l Trade Comm'n 1994).

3. Amendments to the antidumping law enacted in the Uruguay Round Agreements Act ("URAA") apply to investigations initiated on or after January 1, 1995. *See* Uruguay Round Agreements Act, Pub.L. No. 103–465, § 291(a)(1), (b), 108 Stat. 4809, 4931 (1994), *and* Presidential Proclamation No. 6780, 60 Fed.Reg. 15,845 (1995). Because this investigation was initiated prior to January 1, 1995, the amendments do not apply. Accordingly, we cite to the antidumping law in effect before the URAA amendments.

found that Chinese nitromethane was sold at a dumping margin of 233.7%.

In the meantime, pursuant to 19 U.S.C. § 1673b(a) (1988), the ITC conducted its preliminary investigation. In its final determination, the Commission determined, by a vote of four to one, that the domestic industry was not materially injured or threatened with material injury by nitromethane imports from China. *Nitromethane from the People's Republic of China,* Inv. No. 731–TA–650 (Final), USITC Pub. 2773 (May 1994) ("Final Determination"). The Commission defined the domestic industry as all domestic producers of nitromethane during the period of investigation (1990 to 1993). Angus and W.R. Grace & Co. ("Grace") both produced nitromethane during portions of the period of investigation. Grace ceased production of nitromethane in mid–1992, for reasons unrelated to Chinese imports. Thus, by the end of the period of investigation, Angus was the sole member of the domestic industry.

All five of the commissioners[4] joined in a portion of the Final Determination evaluating the condition of the domestic industry. Final Determination at I–8 to I–14. The Commission stated that it considered all economic factors relevant to the condition of the domestic industry, "within the context of the business cycle and conditions of competition that are distinctive to the affected industry," as required by 19 U.S.C. § 1677(7)(C)(iii) (1988). The Commission noted that Angus captively consumed a significant percentage of its nitromethane production,[5] and that captive consumption attenuates competition between the domestic product and the subject imports.

The Commission found that the industry data it evaluated reflected significant disruptions of domestic production during the peri-

od of investigation. A fire and explosion at Angus's plant on May 1, 1991 forced it to cease production for ten months, until March 1992. During that time period, Angus sold product from inventory, sold product that it purchased from Grace, and also sold product that it imported from China. Grace also experienced interruptions in its operations in 1990 and 1991. The Commission found that the industry data also reflected the decision of Grace to cease producing nitromethane in the second quarter of 1992, for reasons unrelated to the subject imports. The Commission found that Grace's decision resulted in many of the decreases in the domestic industry indicators for 1992.

The Commission found that Angus's current operations involve production in a different plant than in earlier years, with entirely different assets and cost structure. The Commission also noted that market conditions changed considerably during the period of investigation. The Commission found that, due to Grace's decision to cease production, purchasers have an interest in the imports as the only alternative source of nitromethane. Because of Grace's decision to cease production and Angus's use of a rebuilt plant, with its different asset and cost basis, the Commission found that 1993 is not directly comparable with 1990, the only other full year of production by the domestic industry *during the period of investigation.* The Commission found that a direct comparison of 1993 and 1990 data would distort the analysis of material injury by the LTFV imports, due to the significant structural changes in the domestic nitromethane industry and market. Accordingly, the Commission focused on the 1993 data and made only limited comparisons between 1993 data and 1990 data.

The Commission evaluated U.S. consumption of nitromethane and found that the

---

4. One of the commissioners did not participate in the determination. Final Determination at I–3 n.2. We note at the outset that both the membership and the offices held by the members of the commission have changed since their decision was rendered. For ease of reference we refer to the individual members by the titles they then held, or simply as "commissioner."

5. In other words, Angus uses a significant portion of its nitromethane production to produce other products, such as compounds that are used in the pharmaceutical and specialty chemical markets.

quantity consumed decreased considerably from 1990 to 1991, but increased slightly in 1992 and 1993. Production and capacity declined considerably from 1990 to 1991 due to the 1991 explosion. In 1992, capacity returned to a level higher than that reported for 1990. Production also increased considerably in 1992, but did not reach the 1990 level. In 1993, capacity decreased only slightly despite the exit of Grace from the domestic industry, and production slightly increased above the 1992 level. Angus's production was higher in 1993 than total industry production in 1992, but not as high as the total industry in 1990.

Domestic producers' U.S. shipments of nitromethane decreased considerably in 1991 and 1992, due to the production shutdowns by Angus in 1991 and Grace in 1992. Shipments increased considerably in 1993. U.S. exports decreased from 1990 to 1991, then increased in 1992 and decreased slightly in 1993. The number of production and related workers producing nitromethane decreased from 1990 to 1991, increased in 1992, and decreased in 1993.

The Commission asked Grace and Angus to provide separate financial data for their nitromethane operations. Grace was unable to report its nitromethane operations data separately from its nitroparaffins data. Angus, on the other hand, reported its nitromethane operations separately. Accordingly, the Commission discussed the nitromethane operations of Angus separately from those of Grace. The Commission considered Grace's nitroparaffins data as the best information available on its nitromethane operations. Noting that Angus accounted for the bulk of industry data for 1990 to 1992, and for all of the data for 1993, the Commission stated that its analysis was based on the condition of the industry as a whole.

The Commission found that Angus's sales decreased considerably from 1990 to 1991, and by a smaller amount in 1992, then increased considerably in 1993, reflecting Angus's return to production. Grace's sales of nitroparaffins increased each year from 1990 to 1992, but decreased in 1993, reflecting its decision to cease production.

Based on this analysis, two of the commissioners, Chairman Newquist and Commissioner Rohr, found that the domestic industry producing nitromethane was not experiencing material injury.

> In particular, they note[d] the robust performance of the domestic industry both before and following the ten-month shutdown of Angus's facility, as demonstrated by increases in 1993 in the industry's share of U.S. apparent consumption, shipments, capacity utilization, and net sales, as well as the strong performance in production and profitability. They note[d] that this strong performance occurred despite the departure of one domestic producer.

Final Determination at I–15 n.79.

Vice Chairman Watson and Commissioner Nuzum separately discussed the three factors specified in 19 U.S.C. § 1677(7)(B) (1988):(1) the volume of imports, (2) the effect of imports on U.S. prices, and (3) the impact of imports on domestic producers. As for volume of imports, they noted that the volume of imports from China increased dramatically from 1990 to 1991, due to a shortage of domestically-produced nitromethane caused by Angus's production shutdown. Vice Chairman Watson and Commissioner Nuzum noted that Angus itself imported a significant amount of nitromethane from China. They noted that import volumes decreased in 1992 and then decreased considerably more in 1993, as Angus stopped importing product and brought its domestic plant back into production. They noted that the market share of imports was small in 1990 and rose considerably in 1991 and 1992, but declined considerably in 1993 to a level below that reported for 1991. They found that Angus's market share was higher in 1993 than it was in 1990, and they found the increased market share probative of the industry's present condition. They found that currently the imports are only an alternative source of supply for U.S. purchasers

that prefer domestic nitromethane, but are fearful of a repetition of the supply disruption that occurred after Angus's plant explosion. Accordingly, they found the level of subject imports to be not significant. Final Determination at I–16 to I–17.

Vice Chairman Watson and Commissioner Nuzum then evaluated the price effects of the LTFV imports, and concluded that the subject imports did not cause significant price depression or suppression. They noted that during Angus's production outage, nitromethane prices were high, and that after Angus reopened its plant, Angus sold both previously-imported Chinese nitromethane and its own production. They found that Angus priced its Chinese product lower than its U.S. product, and lower than Chinese nitromethane sold by other importers. They found that this demonstrates a lack of significant underselling by contemporaneous imports. Final Determination at I–17 to I–21.

Vice Chairman Watson and Commissioner Nuzum then evaluated the impact of LTFV imports on domestic producers. They found that Angus had rebounded from its production shutdown to strong operating performance and dominant market share. In response to its questionnaire, Grace reported that it had difficulty competing on price with Angus, but *not* with the subject imports. They concluded that Grace's decision to cease production of nitromethane was due to factors other than LTFV imports. Based on evidence of import volumes, and Angus's significant net sales, high profitability and operating income, and significant production, they found that the subject imports have not had a significant adverse impact on the domestic industry. Final Determination at I–21 to I–24.

Finally, the Commission majority joined in a single discussion finding no threat of material injury by the LTFV imports, a finding not challenged here by Angus. Final Determination at I–24 to I–27. Although this section of the Commission's opinion focused on whether there was a threat of material injury in the future, the Commission provided further insight into its determination that the industry had not experienced a material injury to date. The Commission determined that continued imports at the same volumes and prices as in 1993 (in the period of investigation) does not present a danger of future material injury. With regard to the amount of imports, the Commission noted that the levels of imports had not been injurious. With respect to prices, the Commission found an absence of a likely depressing or suppressing effect on domestic prices. The Commission found that any decreases in U.S. market prices occurred as a result of Angus selling off its considerable inventory of Chinese imports after its new plant came on line. And, the Commission noted, Angus priced its inventory of Chinese imports lower than its U.S. product and lower than other sellers of the imports. With regard to impact on the domestic industry, the Commission found that future imports are likely to have as little impact on the domestic industry as they had during the period of investigation. The Commission found that U.S. purchasers generally prefer to purchase the U.S. product due to its reliability, shorter lead time, and quality.

Commissioner Crawford dissented from the Commission's determination, and determined that the domestic industry was materially injured by LTFV imports of nitromethane, although she concurred in the discussion of the condition of the domestic industry. Final Determination at I–29 to I–31.

On appeal, the Court of International Trade sustained the Commission's determination that the U.S. nitromethane industry is not materially injured or threatened with material injury by the LTFV imports. *Angus Chem. Co. v. United States*, 944 F.Supp. 943 (Ct. Int'l Trade 1996). This appeal followed.

## DISCUSSION

### I.

Like the Court of International Trade, we review the ITC determination to determine if

it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988); *Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1559 n. 10 (Fed.Cir.1984). *But see Zenith Elecs. Corp. v. United States,* 99 F.3d 1576, 1579 (Fed.Cir.1996) (Plager, J., concurring) (criticizing *Atlantic Sugar* standard of review); *id.* at 1580 (Rader, J., concurring) (same).

## II.

Angus challenges two aspects of the judgment of the Court of International Trade. First, Angus complains that the court erred in affirming the decisions of ITC commissioners Watson and Nuzum, with regard to their evaluation of the volume of LTFV imports, the price effects of those imports, and the impact of the imports on the domestic industry. Essentially, Angus views the decisions of these commissioners as not supported by substantial evidence in the record.

Second, Angus complains that the court erred in affirming the decisions of ITC commissioners Newquist and Rohr, specifically their finding of no material injury. Angus argues that these commissioners based their decision on the health of the domestic industry alone, without taking into account the statutory factors relating to the impact of the imports on the industry. As previously noted, the vote of the Commission was split, four in favor of the finding of no material injury, one opposed. If Angus is correct with regard to either of its complaints, that is, if the vote of either pair of commissioners was invalid, then there would be no majority in support of the Commission's final determination.

 With regard to Angus's first complaint, that the trial court erred in its judgment that there was substantial evidence in the record to support the determinations of commissioners Watson and Nuzum, we find that the trial court carefully reviewed the evidence and the commissioners' view of it, and found substantial support for each of the findings made. We give due respect to the considered views of the Court of International Trade. *See Suramerica de Aleaciones Laminadas, C.A. v. United States,* 44 F.3d 978, 983 (Fed.Cir.1994); *Torrington Co. v. United States,* 938 F.2d 1278, 1280 (Fed.Cir. 1991). We have reviewed the evidence and the trial court's view of it, and find no error in the court's determination. Accordingly, we affirm in this respect.

 The second complaint, that commissioners Newquist and Rohr made their decision without considering the factors mandated by law, presents a more difficult issue. Angus argues that Chairman Newquist and Commissioner Rohr erred in using the so-called "two-step" analysis for material injury. Under this method,

> a commissioner first assesses the state of the relevant domestic industry. If the assessment produces a conclusion that the industry is materially injured, then the analysis proceeds to its second step, which is the separate inquiry asking whether the pertinent imports contribute in a non-de minimis way to such material injury.

*United States Steel Group v. United States,* 96 F.3d 1352, 1361 (Fed.Cir.1996). Thus, under the two-step approach, one first assesses whether there is a material injury, and if so, then determines whether there is causation. In a "one-step" or "unitary" analysis, in contrast, a "commissioner assesses in a unitary process both the current state of the domestic industry and whether that state is materially injured by reason of LTFV" imports. *Id.*

Angus takes the position that use of the two-step analysis does not dispense with consideration of the three factors set forth in the relevant statute, which provides that, in making a determination of material injury,

> the Commission, *in each case—*
>
> (i) *shall consider—*
>
>> (I) the volume of imports of the merchandise which is the subject of the investigation,

(II) the effect of imports of that merchandise on prices in the United States for like products, *and*

(III) the impact of imports of such merchandise on domestic producers of like products, but only in the context of production operations within the United States; *and*

(ii) *may consider* such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports.

19 U.S.C. § 1677(7)(B) (1988) (emphasis added).

In particular, Angus points to the emphasized "in each case" language in the statute, which was added in 1988. *See* Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, § 1328, 102 Stat. 1107, 1205. Angus argues that it was reversible error for Chairman Newquist and Commissioner Rohr to conclude that there was no material injury to the domestic nitromethane industry without evaluating the volume of imports, the effect of imports on U.S. prices, and the impact of imports on domestic producers, as required by § 1677(7).

This court has already considered whether the one-step and two-step analysis methods are consistent with § 1677(7). We held that the statute does not "compel[ ] the commissioners to employ either the one-step or two-step approaches," and that both methods are consistent with the statute. *United States Steel Group*, 96 F.3d at 1361–62. *See also American Spring Wire Corp. v. United States*, 590 F.Supp. 1273, 1276 (Ct. Int'l Trade 1984) (stating that when there is no material injury, "any analysis of causation of injury would [ ] be superfluous"), *aff'd sub nom. Armco, Inc. v. United States*, 760 F.2d 249 (Fed.Cir.1985) (affirming on the basis of the Court of International Trade opinion). Accordingly, we do not now reconsider this issue, and affirm that the Commission, and individual commissioners, in making the required determinations are free to follow either analytical method.

■ That, however, does not answer the question whether, however done, the commissioners must take into account the statutory factors in arriving at their individual and collective determinations of the existence of material injury to a domestic industry. Our first task, then, is to determine what the statute requires, and, if it requires that commissioners specifically consider the enumerated factors, assess whether commissioners Newquist and Rohr did so.

■ We begin, as we must, with the language of the statute itself. If that language is unambiguous, it controls. *See Muwwakkil v. Office of Personnel Management*, 18 F.3d 921, 924 (Fed.Cir.1994) ("When statutory interpretation is at issue, the plain and unambiguous meaning of a statute prevails."); *West Virginia Univ. Hosp., Inc. v. Casey*, 499 U.S. 83, 98–99, 111 S.Ct. 1138, 1146–47, 113 L.Ed.2d 68 (1991). This is often referred to as the "plain meaning" rule.

The statutory language at issue here could not be clearer. The subsection at issue, § 1677(7), is entitled "Material injury." The subsection first defines "material injury" as "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A). The subsection next states that "the Commission, *in each case* [ ] *shall consider* " the volume of imports, the effect of imports on U.S. prices, and the impact of imports on domestic producers, and *"may consider* such other economic factors" relevant to "whether there is a material injury by reason of imports." 19 U.S.C. § 1677(7)(B) (emphasis added).

This language contains no ambiguity. It unmistakably requires the Commission to consider the three listed factors in making its material injury determination. In contrast, it permissively allows the Commission to consider other relevant factors as well, as the particulars of the case at hand may warrant. The subsection further states that "the Commission shall explain its analysis" of each of the three mandatory factors as well as any other factors considered. *Id.*

In opposing what the statute unambiguously says, the Government places heavy reli-

ance on the two-step analysis summarized in *United States Steel Group*, 96 F.3d at 1361. The Government argues that this two-step analysis has long been used by the Commission, well prior to the 1988 amendment that added the "in each case" language. The Government cites extensively to legislative history to support its assertion that Congress has at least implicitly endorsed the two-step analysis and that the 1988 amendment was not intended to displace that analysis.

However, establishing the continued vitality of the two-step analysis—which, as already noted, we do not question in this case—does not overcome the mandatory language in § 1677(7)(B). Simply put, the two-step test cannot be construed as dispensing with consideration of the three mandatory factors in those cases in which step one is determinative of the outcome. Neither in *United States Steel Group* nor in any other opinion of this court, or for that matter of the Court of International Trade, has it been held prior to this case that the mandatory factors may be ignored when using the two-step analysis. To the contrary, the court in *United States Steel Group* carefully differentiated between those statutory factors that "must" be applied and those that "may" be applied. *United States Steel Group*, 96 F.3d at 1360. As the explicit language in § 1677(7)(B)(i) makes clear, regardless of what approach is used, whether it be the two-step or unitary approach or some other approach, the three mandatory factors must be considered in each case.

Requiring the Commission to consider these statutory factors in each case is not inconsistent with utilization of the two-step method. Under that method, a commissioner considers first whether there was material injury, and second whether it was caused by the challenged imports. *Id.* at 1361. What the statute mandates is that the decision in step one cannot dispose of the case without taking into account the entire condition of the industry, both its economic condition *per se,* and the overall competitive condition including imports. It is not enough to simply determine that the industry is healthy in the

abstract and thus conclude that the challenged imports have not materially injured the domestic industry. Compliance with this requirement is not the same as the additional analytical step of determining the precise causal connection between the imports and any perceived harm to the industry; that is reserved for step two, and, under the two-step analysis, need not be undertaken if the answer to step one, properly analyzed, is that no material injury has occurred.

Besides the unambiguous statutory language, this conclusion finds strong support in the legislative history of the 1988 addition of the "in each case" language to § 1677(7):

> The Committee ... is concerned that certain Commissioners may base a negative determination on simply one factor without even examining the others. A sound determination of material injury cannot be made unless there is a thorough analysis of the volume of imports, the price effects of those imports, and the impact which imports at that volume and at such prices are having on domestic producers.

S. Rep. No. 100–71, at 116 (1987).

Requiring consideration of the three statutory factors in step one of the two-step method prior to reaching a conclusion may lessen that method's appeal, because it may eliminate a shortcut to a negative determination. However, that possible result does not justify side-stepping the statutory mandate.

■ Having concluded that the statute places on the Commission in arriving at its material injury determination an affirmative duty to consider the three factors set out in § 1677(7)(B)(i), we must ask the question: In this case did the Commission comply with the statute? It is clear from the record that commissioners Watson and Nuzum did exactly that, and as we have earlier indicated, the Court of International Trade did not err in finding that there is substantial evidence in the record to support their findings in that regard.

With respect to commissioners Newquist and Rohr, while they did not join commis-

sioners Watson and Nuzum's separate discussion of the three factors set out in § 1677(7)(B)(i), they did join other portions of the Commission's opinion that also addressed those factors, although more indirectly. Those other portions of the opinion are certainly not a model analysis of the three statutory factors, and as a consequence, this is a close case. Nonetheless, on balance we have determined that those portions of the opinion joined by commissioners Newquist and Rohr contain sufficient analysis and findings with regard to the three factors to satisfy the statute.

In particular, in those portions of the opinion, the Commission majority concluded that: (1) the levels of Chinese imports have not been injurious; (2) the increases in the imports during the period of investigation occurred as a result of the domestic shortage caused by the explosion at Angus's plant, but have since subsided considerably, assuming a position as a secondary source of supply for domestic consumers; (3) since Angus's return to production, the Chinese plants that had produced the nitromethane that was imported into the United States have shut down or returned to producing unrelated chemicals; (4) the imports have not had a depressing or suppressing effect on domestic prices; (5) the imports that entered the domestic market after the explosion at Angus's plant were at a price higher than that in 1990 (before the explosion), when imports were entering at *de minimis* levels; (6) the decrease in U.S. market price for nitromethane during the period of investigation occurred as a result of Angus selling off its considerable inventory of Chinese nitromethane after its new plant came on line; (7) Angus priced its inventory of Chinese imports lower than its U.S. product and lower than other importers of the Chinese product; (8) the imports have had little adverse impact on the domestic industry, having considered the factors specified in § 1677(7)(C)(iii); (9) much of Angus's production of nitromethane is devoted to captive consumption, which is not affected by imports; (10) Grace did not decide to stop producing nitromethane because of pressure from imports; and (11) the U.S. product is preferred by consumers because of its reliability, shorter lead time, and higher quality.

Under the circumstances of this case, we conclude that those findings are sufficient to satisfy the requirements of § 1677(7)(B) that the Commission consider the volume of the imports, the effect of those imports on U.S. prices, and the impact of those imports on domestic producers, and that it explain its analysis of each factor. Because there is substantial evidence in the record to support those findings, the judgment of the Court of International Trade must be sustained.

*AFFIRMED.*

## COSTS

Each party to bear its own costs.